805 So.2d 893 (2001)
LEE COUNTY, Appellant,
v.
SOUTH FLORIDA WATER MANAGEMENT DISTRICT, a special tax district of the State of Florida, Appellee.
No. 2D00-1773.
District Court of Appeal of Florida, Second District.
October 12, 2001.
*894 James G. Yaeger, Lee County Attorney, and Thomas L. Wright, Assistant County Attorney, Fort Myers, for Appellant.
John J. Fumero, General Counsel, and James E. Nutt, West Palm Beach, for Appellee.
NORTHCUTT, Judge.
Lee County contends the circuit court should have granted its petition to temporarily enjoin the South Florida Water Management District from implementing an emergency plan to discharge a large volume of fresh water from Lake Okeechobee into the Caloosahatchee River. Although the discharge had been accomplished by the time this appeal was briefed, the county urges us to decide the case and to prohibit the district from taking similar actions in the future. After carefully studying this complex matter, we conclude that the circuit court correctly denied the county's petition, but we do not entirely agree with one of its reasons.
The legislature has established five water management districts to regulate and safeguard Florida's water resources. Under the law, the districts endeavor both to ensure an adequate supply of drinking water and to protect the well-being of the state's natural water resources. § 373.0831, Fla. Stat. (1999). They operate in conjunction with, and in large part pursuant to authority delegated by, the Department of Environmental Protection. §§ 373.026, 373.046, Fla. Stat. (1999).
The hydrological system for which the South Florida Water Management District is responsible includes Lake Okeechobee and the Florida Everglades, as well as the rivers and estuaries that interact with them. The Caloosahatchee River originates in the marshlands at the southwest edge of Lake Okeechobee and flows west and southwest to the Gulf of Mexico. Its lower end and estuary lie in Lee County.
It is unnecessary here to recount the history of human alterations to this natural system, which began in earnest in the nineteenth century and continue to this day. It suffices to note two salient features of the existing system. First, Lake Okeechobee is diked such that its drainage now is virtually entirely dependent on human decision-making processes. Second, one of the lake's drainage avenues is the *895 Caloosahatchee River via a canal that was cut from its marshland headwaters to the lake over a century ago.
The instant controversy arose in the spring of 2000. For reasons that are not entirely apparent in our somewhat truncated record, the level of Lake Okeechobee had been permitted to rise during several years of relatively active rainy seasons. This had a number of deleterious effects. Among them was the wider dispersal of phosphate-laden agricultural runoff, which normally tended to collect near the lake's center. Also, the greater water depth filtered more sunlight, darkening the lower reaches to the detriment of bottom-dwelling grasses and other organisms. All of this was known to SFWMD, but in the spring of 2000 it received a sobering report. A recent assessment of the lake's fish population revealed that Lake Okeechobee was no longer merely ailing. It was in its death throes and might not survive another year.
With another rainy season looming, in April 2000 SFWMD set about devising a way to greatly and quickly lower the lake. The district staff sought input from concerned parties at a public workshop on April 19. Then, at an emergency meeting held on hastened notice pursuant to section 120.525(3), Florida Statutes (1999), on April 25 the district's governing board adopted the "Shared Adversity Plan" recommended by its staff. Under the plan, SFWMD hoped to lower the level of Lake Okeechobee to thirteen feet N.G.V.D., a reduction of nearly two feet, by June 1 and to hold it at that level or lower for eight weeks.[1] As the name of SFWMD's plan implied, however, draining so much fresh water from the lake so quickly was certain to adversely affect the water bodies into which it poured. At the planned rate of 3,172 cubic feet per second (cfs), the outflow to the Caloosahatchee would severely reduce the salinity of its estuary, rendering it inhospitable to and in some cases uninhabitable by much of its plant and animal population.
Lee County hurried into court to stop the endeavor, attacking on two fronts. One was in this court, in an administrative appeal of SFWMD's emergency resolution adopting the Shared Adversity Plan. We affirmed over Lee County's challenge to the district's finding of an immediate danger and necessity, which had permitted it to act on an emergency basis without honoring the full notice requirements imposed by Florida's Administrative Procedure Act, Chapter 120, Florida Statutes (1999). Lee County v. S. Fla. Water Mgmt. Dist., 766 So.2d 1103 (Fla. 2d DCA 2000).
The county also petitioned the circuit court to temporarily enjoin SFWMD from discharging Lake Okeechobee's water into the Caloosahatchee at a rate greater than 800 cfs. This action was filed pursuant to the Environmental Protection Act of 1971, section 403.412, Florida Statutes (1999). Specifically, the county invoked subsection (2)(a)2. of the law, which permits the Department of Legal Affairs or any political subdivision or citizen of Florida to sue to enjoin any person or government agency from violating laws protecting the state's natural resources.
As a condition precedent to filing such an action, subsection (2)(c) of the statute requires the complaining party to first make a verified complaint to the government agency or agencies responsible for enforcing the law at issue. The agencies then have thirty days in which to take appropriate action, failing which the complainant may file its lawsuit. However, *896 the statute provides that failure to comply with this condition precedent does not bar an action for a temporary restraining order "to prevent immediate and irreparable harm from the conduct or activity complained of." § 403.412(2)(c), Fla. Stat. (1999). This litigation was filed under this exception to the condition precedent requirement. Our record does not disclose whether Lee County otherwise proceeded with an administrative complaint.
The circuit court denied the petition after an evidentiary hearing at which the parties presented testimony by expert and lay witnesses. As a practical matter, the controversy is moot. However, we decide Lee County's appeal because it raises questions that are of great public importance or are likely to recur, Holly v. Auld, 450 So.2d 217, 218 n. 1 (Fla.1984), Blalock v. Rice, 707 So.2d 738, 739 (Fla. 2d DCA 1997), and it alleges error that is capable of repetition yet evading review. N.W. v. State, 767 So.2d 446, 447 n. 2 (Fla.2000).
In its order the court correctly observed that the county was required to make the showing traditionally demanded of applicants for temporary injunctions, i.e., a clear legal right or interest in the subject matter, a likelihood of irreparable harm, a substantial likelihood of succeeding on the merits, Oxford Int'l Bank & Trust, Ltd. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc., 374 So.2d 54 (Fla. 3d DCA 1979), and, in cases such as this, a showing that the public interest would be served or would not be injured by the granting of the injunction, Wilson v. Sandstrom, 317 So.2d 732 (Fla.1975). See also Dep't of Envtl. Regulation v. Kaszyk, 590 So.2d 1010 (Fla. 3d DCA 1991).
Because the respondent was a state authority whose action was at least facially within its discretion, the court also correctly added the proviso that in order to succeed the county must prove that SFWMD's planned conduct would constitute a patent violation of law, or such a palpable abuse of authority as to be commensurate with illegality. Concerned Citizens of Putnam County for Responsive Gov't, Inc. v. St. Johns River Water Mgmt. Dist., 622 So.2d 520, 524 (Fla. 5th DCA 1993); Friends of the Everglades, Inc. v. Bd. of County Comm'rs of Monroe County, 456 So.2d 904, 914 (Fla. 1st DCA 1984).
On appeal, Lee County challenges two determinations made by the circuit court in the course of denying the injunction. First, the county contends the court erred as a matter of law when it found that the Shared Adversity Plan violated no law. It argues that because the salinity of the Caloosahatchee estuary would be altered by the planned introduction of a large volume of fresh water, the fresh water constituted "pollution," a term defined in section 403.031(7), Florida Statutes (1999), as
the presence in the outdoor atmosphere or waters of the state of [ ... ] human-induced impairment of air or waters or alteration of the chemical, physical, biological, or radiological integrity of air or water in quantities or at levels which are or may be potentially harmful or injurious to human health or welfare, animal or plant life [ ... ] unless authorized by applicable law.
It is illegal to "cause pollution," except as otherwise provided by law, "so as to harm or injure human health or welfare, animal, plant, or aquatic life or property." § 403.161(1)(a), Fla. Stat. (1999).
The circuit court rejected this argument, positing that "it is both logically and legally impossible for Lee County to be `polluted,' as that term is defined by section 403.031(7), through discharges of water from another navigable waterway of the *897 State of Florida." We do not endorse that rather broad assertion, but we agree that in this case Lee County did not prove that SFWMD's action was patently illegal or such a palpable abuse of authority as to be commensurate with illegality.
The reason has to do with the variability of nature. The pollution control portion of Florida's environmental control law is prefaced by a legislative declaration of intent and public policy, set forth in section 403.021, Florida Statutes (1999). In subsection 403.021(11), the legislature recorded its intent that water quality standards be established and applied "to take into account the variability occurring in nature." The subsection directs the Department of Environmental Protection to "recognize that some deviations from water quality standards occur as the result of natural background conditions." Further, "[t]he department shall not consider deviations from water quality standards to be violations when the discharger can demonstrate that the deviations would occur in the absence of any human-induced discharges or alterations to the water body."
In this case, Lee County argued that to maintain a salinity level conducive to the widest range of organisms living in the Caloosahatchee estuary the optimum rate of fresh water discharge into the river must be between 300 and 800 cfs. This conclusion was expressed in a document previously created by the SFWMD's own staff and introduced into evidence in the circuit court. However, that document also reflected that, according to measurements taken during the 28-year period 1966-1994, the long-term mean daily discharge of fresh water into the Caloosahatchee estuary was between 300 and 3,000 cfs. The document also stated that there are high and low flow periods each year during both the rainy season and the dry season. "This is largely related to the source of the water: Lake Okeechobee accounts for only about 25%, and rainfall runoff from the basin normally contributes the remaining 75% of the total discharge through S-79 [the control structure directly upstream from the estuary] during the wet season." The authors further reported that daily and monthly inflow of fresh water into the estuary can be highly variable. As an example, they compared 1995 to the long-term averages. "If 300 and 2,800 cfs are used to bracket the normal daily wet season inflow range, then flows in 1995 began below 300 cfs, bounced above 2,800 cfs several times, then remained well above normal (7,000-17,000 cfs) during the later portion of the wet season. This was largely because of uncharacteristic wet season releases from the lake. Without the lake releases, S-79 daily discharges would have returned twice to the bracketed range and some measure of normal salinity could have returned to the lower estuary."
From these facts two important things become clear. First, nature itself is not constrained to maintain the optimum conditions contended for by the county in this case. Second, given this natural variability (if anything in this highly engineered environment can still be referred to as truly "natural"), it is impossible to characterize SFWMD's plan to save Lake Okeechobee by temporarily discharging fresh water into the river at a rate slightly exceeding the 28-year daily mean as patently illegal or so palpably abusive of its authority as to be commensurate with illegality.
We also reject the county's second assertion, that the circuit court erred when it found that the Shared Adversity Plan would cause no irreparable harm. It is important to emphasize that the court did not find as such. Rather, it acknowledged that the contemplated discharges would damage the river and estuary, but it could *898 not conclude that the damage would be irreparable. In light of the testimony of district experts who opined that the effects of the discharges would be temporary, this finding was supported by substantial competent evidence.
For the reasons described, we conclude that the circuit court acted within its discretion and the law when denying the temporary injunction.
Affirmed.
WHATLEY, A.C.J., and SALCINES, J., Concur.
NOTES
[1] The acronym N.G.V.D. refers to the National Geodetic Vertical Datum, a nationwide reference surface used for measuring elevations throughout the United States.